```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,          Case No. 21-20405
         -v-
 5
      NOE GARZA,
 6
                      Defendant.
 7    _____/

 8                         MOTION HEARING

 9            BEFORE THE HONORABLE MATTHEW F. LEITMAN
                   United States District Judge
10                       Federal Building
                         600 Church Street
11                        Flint, Michigan
                        December 21, 2021
12
      APPEARANCES:
13
      FOR THE PLAINTIFF:    JULES M. DEPORRE
14                          United States Attorney's Office
                            600 Flint Street
15                          Suite 210
                            Flint, MI 48502
16
      FOR THE DEFENDANT:    CHARLES O. LONGSTREET, II
17                          Longstreet Law Firm PLLC
                            18971 Livernois
18                          Detroit, MI 48221

19

20

21

22
               To Obtain a Certified Transcript Contact:
23    Christin E. Russell, RDR, CRR, FCRR, CSR - (248) 420-2720
                Proceedings produced by mechanical stenography.
24        Transcript produced by computer-aided Transcription.

25
```

1

                              TABLE OF CONTENTS

2

3    WITNESSES FOR THE GOVERNMENT:                            PAGE

4
       OFFICER STEVEN FISHER
5        Direct Examination by Mr. DePorre                      9
         Cross-Examination by Mr. Longstreet                   60
6        Voir Dire by Mr. DePorre                              70

7                         E X H I B I T S

8
       GX 1                                                    25
9      GX 2                                                    41
       GX 3                                                    42
10     GX 4-8                                                  42

11

12

13

14

15     CERTIFICATE OF REPORTER                                 77

16

17

18

19

20

21

22

23

24

25

```
 1  Flint, Michigan
 2  December 21, 2021
 3  9:41 a.m.
 4          (Call to Order of The Court; all parties present.)
 5                    *              *              *
 6          THE CLERK:  The Court calls case 21-20405, United
 7  States of America vs. Noe Garza.
 8          Counsel, please state your appearances for the record.
 9          MR. DEPORRE:  Good morning, your Honor.  Jules DePorre
10  appearing on behalf of the United States.
11          THE COURT:  Good morning.  Welcome.
12          MR. LONGSTREET:  Good morning, your Honor.  May it
13  please this Honorable Court, Charles Oliver Longstreet, II,
14  P68205, appearing on behalf of Mr. Noe Garza who is present and
15  seated to my left.
16          THE COURT:  Good morning to both of you.
17          Okay.  Thanks to everybody for joining me.  Please be
18  seated.
19          We're here this morning for a hearing on the motion to
20  suppress that Mr. Longstreet filed on behalf of Mr. Garza.  I
21  have a couple of questions that I wanted to ask just before we
22  start so I can help get my head around a couple of things in
23  this case.
24          Mr. DePorre, a couple of my questions are for you.
25  When I was preparing for this morning, I read the complaint and
```

MOTION HEARING - 12/21/2021

4

 1    then I compared that to the indictment.  And the motion to

 2    suppress is aimed at evidence that was obtained on November

 3    26th, and the charges in the indictment are for November 26th,

 4    but the complaint talks about a separate incident at the Burton

 5    Inn on November 20th that appeared to have involved a gun and

 6    drugs.

 7            And can you help me understand how that didn't make it

 8    into the indictment or why we're not just talking about that

 9    stuff?

10            MR. DEPORRE:  The Government determined that it was

11    best not to indict that at this juncture.  We did not present

12    that to the grand jury.  We didn't ask the grand jury to return

13    an indictment on the charges related to the Burton Inn.  And

14    that's probably the best answer I can give the Court.

15            THE COURT:  Okay.  The second question is when I read

16    your response to the motion, one of the points you make is that

17    I shouldn't suppress the evidence here because there was a

18    bench warrant out for Mr. Garza's arrest at the moment the

19    officers came into contact with him.  And I understood you to

20    be saying that since there was a warrant out, they could have

21    arrested him under the warrant.  But I -- is that your, one of

22    your arguments here?

23            MR. DEPORRE:  It is, your Honor.  One of the things

24    that the Government maintains is that both the attenuation

25    doctrine and the inevitable discovery doctrine come into play

1     in this case.

2            The attenuation doctrine, I think, is important in

3     that there are two, actually, two arrest warrants for Mr. Garza

4     at the time that police come and make an initial contact with

5     them.

6            So setting aside the arguments that the defendant has

7     made on whether or not the officers had probable cause or

8     reasonable suspicion to allow for Mr. Garza's detention, had

9     they run Mr. Garza immediately, and eventually they did run Mr.

10    Garza through a criminal enforcement database called LEIN, the

11    law information -- Law Enforcement Information Network, and

12    that query showed the officers that he had two outstanding

13    warrants.

14           And so I will be asking the Court, and I think Mr.

15    Longstreet also will be asking the Court's indulgence to submit

16    post hearing briefs on this, in this case.  And what I wanted

17    to present in my initial briefs is the Government's position

18    that the attenuation and inevitable discovery doctrines come

19    into play in part because of the fact that Mr. Garza had active

20    warrants.

21           THE COURT:  Is the idea that the officers walk out to

22    this car, they have some possible basis to deal with the

23    driver?  But help me understand how it is they have a basis to

24    interact with Mr. Garza.

25           MR. DEPORRE:  Mr. Garza is the driver of the car.

1          THE COURT:  I'm sorry.  They have -- I didn't mean

2   driver versus non-driver.  I meant they have a basis to

3   interact with the fellow who is suspected of shoplifting.

4          MR. DEPORRE:  Right.  So at the time that the officers

5   -- I anticipate that the testimony today will show that when

6   the officers go to the Pontiac Grand Prix, they have

7   information from Meijer loss prevention folks that somebody had

8   been in the store, had been shoplifting in the store, and had

9   left, gone out to the parking lot to a white Pontiac Grand

10  Prix.  They didn't know at that point whether or not it was Mr.

11  Garza or Mr. Hutchins.  So I think at the time that the

12  officers make initial contact, they do learn later that it's

13  Mr. Hutchins.  But I think when they make their initial

14  contact, the testimony will show today, that they weren't

15  really sure who it was.

16         The other thing I anticipate the testimony today will

17  show is that it is common for people involved in shoplifting,

18  like the situation here, to have more than one person involved

19  in the crime.  So to have a lookout who stays outside in the

20  parking lot to make sure that there are no cops coming into the

21  parking lot while somebody is in the store shoplifting.

22         And I think the testimony today will show that

23  officers had a reasonable suspicion to approach and speak with

24  both Mr. Garza, the driver, and Mr. Hutchins; and that they had

25  probable cause to search the, certainly the rear portion of the

1   car where Mr. Hutchins had been after they had established that

2   Mr. Hutchins was, in fact, the person involved in the

3   shoplifting and had the backpack that had been used for

4   shoplifting in the back of the car.  I think they had probable

5   cause to search the back of the car in the automobile

6   exception.

7          I also believe they had other reasons that they were

8   eventually able to search the car based on the fact that it was

9   -- it didn't have a proper license plate, it wasn't registered,

10  it didn't have insurance.  So it couldn't leave that Meijer

11  parking lot.  And Meijer has given the local police in that

12  area the ability to tow cars that cannot be driven away from

13  its parking lot.

14         So I do think that -- I think all of those factors

15  will come into play in the post, post briefing -- or post

16  hearing briefing.

17         THE COURT:  Okay.  That's helpful.

18         Do you want to call your first witness?

19         MR. DEPORRE:  Before we do, Mr. Longstreet also

20  mentioned an issue that he had not raised in the briefing.  And

21  I just wanted to let him address that, if he wants to, for the

22  Court.

23         THE COURT:  Sure.

24         MR. LONGSTREET:  I would.  I appreciate that.

25         Thank you, your Honor.  Charles Longstreet, II, on

1    behalf of Mr. Noe Garza.

2           There is an additional issue that is contained within

3    these police reports that I identify in preparation of this,

4    this particular hearing, and that is an unlawful inventory

5    search.  I didn't realize at the time that there was a second

6    inventory search which is the subject of the firearm that was

7    allegedly carried by my client on the day of this incident.

8    There is once inventory search that's conducted at the Meijer

9    parking lot, which we believe is subject to an unlawful arrest.

10          The second inventory search takes place after they

11   speak to a co-defendant.  The co-defendant provides the police

12   with particular information.  And based on that information,

13   they allege a "second" inventory search, and they discover a

14   firearm underneath the hood of the car.  This was not for

15   safekeeping of any of the client's property.

16          There also becomes an issue in regards to possession,

17   whether it's actual or constructive.  There is additional

18   issues in regards to the inventory search illegality that are

19   presented in the police reports I did not address in my brief.

20   And I would be submitting supplemental briefing as to the

21   specific issue of an illegal inventory search on top of the

22   illegal arrest.

23          THE COURT:  All right.  So I'll treat what you said as

24   kind of a supplement or amendment to your motion, and you're

25   free to develop an evidentiary record on that point today and

 1   to address it in your supplemental brief.  Thank you for

 2   pointing it out now.  Mr. DePorre can bring out evidence that

 3   he thinks is relevant to this argument that you're going to

 4   make, too.  So I think we're all on the same page, and I'm

 5   comfortable with us exploring that today during the hearing.

 6              MR. LONGSTREET:  Very good.  Thank you.

 7              THE COURT:  Okay.  Ready?

 8              MR. DEPORRE:  Yes, your Honor.  The Government calls

 9   Officer Steven Fisher.

10       (Witness is sworn.)

11              THE COURT:  Officer, welcome to the United States

12   District Court.  Please make yourself comfortable.  When you're

13   testifying, will you please take off your mask so we can hear

14   you clearly?  And can you please speak slowly and keep your

15   voice up?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Thank you very much.

18                      OFFICER STEVEN FISHER

19       called as a witness at 9:51 a.m., testified as follows:

20                       DIRECT EXAMINATION

21   BY MR. DEPORRE:

22   Q.  Good morning, Officer Fisher.

23   A.  Good morning.

24   Q.  I didn't catch if you spelled your first and last name for

25   the court reporter, but if you haven't, would you do so now?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE

10

```
1   A.   Yes.  Steven, S-T-E-V-E-N, Fisher, F-I-S-H-E-R.

2   Q.   Mr. Fisher, how are you currently employed?

3   A.   I'm an officer with the Metro Police Authority of Genesee

4   County.

5   Q.   And how long have you been a police officer with the Metro

6   Police Authority of Genesee County?

7   A.   Two years.

8   Q.   What is the Metro Police Authority, what is the area or the

9   jurisdiction in which they cover?

10  A.   We provide law enforcement services to Mundy Township and

11  the City of Swartz Creek.

12  Q.   And before your department was known as Metro Police

13  Authority, was it broken into two separate police departments?

14  A.   It was.  Before the merger, it was Mundy Township Police

15  Department and the City of Swartz Creek Police Department.

16  Q.   Before you worked at Mundy Township, were you also a police

17  department -- or police officer in other departments?

18  A.   I was.

19  Q.   And how long total have you been employed as a police

20  officer?

21  A.   Ten years.

22  Q.   Have those all been in the Genesee County area or have you

23  also had employment in other counties?

24  A.   I've worked in other counties also.

25  Q.   And specifically, did you work in counties north of
```

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE                11

1   Genesee?

2   A.  Yes.

3   Q.  Which were they?

4   A.  I worked in Roscommon County, for the Roscommon County

5   Sheriff's Office, Ogemaw County for the Ogemaw County Sheriff's

6   Office.  I worked in Gladwin County for the Gladwin City Police

7   Department as well.

8   Q.  And were all of those around the same time in your career?

9   A.  Yes.  I was a part-time employee at all three of those

10  departments.  And I've maintained employment at all three of

11  them at -- for about six months, I was at all three of them.

12  Q.  I want to ask you about some events that occurred on

13  November 26th, 2020.  Do you remember what you were doing that

14  morning?

15  A.  Yes.

16  Q.  And was that a, was that a notable day, putting aside the

17  events that happened with respect to this case?

18  A.  That was Thanksgiving day, 2020.

19  Q.  That morning, you had a meeting at Meijer on Hill Road; is

20  that right?

21  A.  I was I believe dispatched to Meijer to speak with loss

22  prevention about a retail fraud.

23  Q.  And do you recall around what time you went out to the

24  Meijer?

25  A.  It was after nine o'clock in the morning.

12

 1   Q.  Meijer is located on Hill Road.  Is that in Mundy Township?
 2   A.  It is.
 3   Q.  And is there another Meijer within the jurisdiction of the
 4   Metro Police Authority?
 5   A.  Yes, Swartz Creek on Morrish Road.
 6   Q.  Do you have -- is it common to have you dispatched for
 7   retail fraud cases at the Meijer?
 8   A.  Very common, yes.
 9   Q.  I'd like you to describe the Meijer on Hill Road a little
10   bit.  How is it oriented with respect to Hill Road?
11   A.  It's on the north side of Hill Road east of Torrey Road.
12   Q.  And when you arrived there, where did you park your police
13   cruiser?
14   A.  On the west side of the building closer to Torrey Road.
15   Q.  Where do most people enter the Meijer from?
16   A.  From the south side.
17   Q.  And is that where Hill Road is?
18   A.  Correct.
19   Q.  Where is the main parking lot for Meijer?
20   A.  South of the building along Hill Road.
21   Q.  And on the south side of the Meijer building overlooking
22   the parking lot, describe what the Meijer -- what does it look
23   like?
24   A.  It's got a large window front between the two entry doors
25   on either side of the building.

1    Q.  Does that allow people to look out to the parking lot?

2    A.  Yes.

3    Q.  You said you were meeting with people from loss prevention;

4    is that correct?

5    A.  Correct.

6    Q.  And specifically who you were meeting with?

7    A.  Jodi Montpas.

8    Q.  Anybody else?

9    A.  I was with my, at the time sergeant, Sergeant Todd Johnson

10   was there as well.

11   Q.  And did he drive with you or separate?

12   A.  We were in separate patrol cars.

13   Q.  Did you guys arrive at the Meijer at the same time?

14   A.  Very nearly, yes.

15   Q.  Do you recall who arrived first?

16   A.  I do not.

17   Q.  And do you recall how you entered the Meijer?

18   A.  It's through, I would call it a back door, employee only

19   entrance.  It goes into the employee break room, and then

20   through the break room out to a hallway, and across that

21   hallway is the loss prevention office.

22   Q.  And that's where you had your meeting?

23   A.  Yes.

24   Q.  Why didn't you go through the front door that morning?

25   A.  It's a longer walk from the front door back to the back of

1   the store where the loss prevention office is.

2   Q.  Now, had you been to that office before?

3   A.  Yes.

4   Q.  How many times?

5   A.  Dozens.  Dozens.

6   Q.  When you say dozens and dozens, more than 24, more than 30?

7   A.  I'm sorry.  I just, just more than, more than 12 for sure.

8   Q.  And at the point back in November on Thanksgiving morning

9   of 2020, had you been there dozens of times, more than 12

10  times?

11  A.  Yes.

12  Q.  You mentioned there is another Meijer.  Is there also

13  another major retailer within Metro Police Authority's

14  jurisdiction?

15  A.  There is.

16  Q.  What is that?

17  A.  Home Depot on Hill Road.

18  Q.  And do you also receive shoplifting calls for the Home

19  Depot?

20          MR. LONGSTREET:  I'm going to object to the relevance.

21          THE COURT:  What's the relevance of Home Depot?

22          MR. DEPORRE:  Your Honor, the relevance is related to

23  the officer's knowledge about shoplifting and what sort of

24  patterns and practice criminals engage in when they are

25  committing shoplifting offenses.

```
 1              MR. LONGSTREET:  With all due respect to the
 2    Government's position, the relevance of what other criminals do
 3    at other stores at other times and other places is irrelevant
 4    to what Mr. Noe Garza did on this specific date, thus, we
 5    believe it's irrelevant.
 6              THE COURT:  A couple things.  I'm having a little
 7    trouble hearing you, Mr. Longstreet.  Are you comfortable
 8    taking off your mask when you're speaking?
 9              MR. LONGSTREET:  I am absolutely comfortable taking
10    off my mask.  Not a problem.
11              THE COURT:  All right.  Good.  Thank you.  All right.
12    Can you restate the objection?  I want to make sure I hear it
13    all.
14              MR. LONGSTREET:  Again, my objection is, in this
15    instance, the police officer's knowledge of what other
16    criminals do at other places and other locations on other days
17    has no bearing or relevance as to what Mr. Noe Garza did on
18    this particular incident in regards to what our motion is, and
19    thus, the evidence as being drawn from the Government at this
20    time is irrelevant to the issues presented in this matter.
21              THE COURT:  All right.  I appreciate the objection.
22    I'm going to overrule it.  My understanding is that what Mr.
23    DePorre wants to do is to develop this evidence to show modus
24    operandi or patterns or practices engaged in by shoplifters.
25    And that would be relevant to whether the conduct observed by
```

1    Mr. Garza was consistent with patterns and practices of

2    shoplifters which could conceivably be used to support an

3    argument that there was probable cause or reasonable suspicion

4    to engage with him.  So I'm going to overrule the objection.

5              MR. LONGSTREET:  Very well.

6    BY MR. DEPORRE:

7    Q.  Have you had meetings with the loss prevention team at Home

8    Depot as well?

9    A.  I have.

10   Q.  And approximately how many shoplifting complaints have you

11   been dispatched for to Home Depot?

12   A.  More than 20 at least.

13   Q.  How about that other Meijer in Swartz Creek?  Back in

14   November of 2020, have you had shoplifting calls that you had

15   been dispatched to at that Meijer in Swartz Creek as well?

16   A.  Yes.

17   Q.  And had you also spoken with other officers at Metro about

18   the shoplifting offenses?

19   A.  Yes.

20   Q.  Who had you spoken to?

21   A.  We have daily shift briefings, roll calls where we discuss

22   recent patterns of criminal activity.  So it's really

23   conversation between all the officers on the shift, the

24   sergeant for the shift, so multiple officers.

25   Q.  And in those conversations, did officers talk about the

1  sort of typical ways in which people shoplift?

2  A.  Yes.

3  Q.  And can you describe those for the Court?

4  A.  Very often, shoplifting is done as a team effort.  The

5  lion's share of shoplifting incidents are perpetuated by drug

6  users.

7       MR. LONGSTREET:  Objection again.  Irrelevance in

8  regards to what other shoplifters' drug habits are in regards

9  to what Mr. Noe Garza did and whether he had the right to

10  arrest Mr. Garza on this particular day.  It's irrelevant to

11  the issues.

12       THE COURT:  Again, I appreciate the objection.  I'm

13  going to overrule it.  Go ahead.

14  BY MR. DEPORRE:

15  Q.  You can answer the question.

16  A.  The question again, sir?

17  Q.  Sure.  I was asking you to describe to the Court what the

18  normal ways in which people shoplift are.

19  A.  Yes.  It's very often a team effort, in groups of two or

20  more typically.  Very often, there is somebody that will stay

21  in a vehicle in the parking lot of the establishment to act as

22  a lookout.  It's some times that person is in the driver's

23  seat, sometimes not.  But the intent is to call the people that

24  are in the store if they see patrol cars coming so the suspects

25  inside the store can get rid of the merchandise and not commit

1   the crime.

2   Q.  Are you familiar with Meijer's policies, Meijer's internal

3   policies in dealing with shoplifters?

4   A.  I know that the typical practice is that they would, if

5   there is a loss prevention agent working, they observe somebody

6   concealing merchandise, they will call Genesee County dispatch

7   or call 9-1-1 and have officers come to the store.  Many times

8   they will stay on the phone with our dispatch and give updates

9   on the location and the description of the suspects, what

10  they've taken, where they've concealed it, let us know what

11  door they are coming out of.

12          After that, after the suspects are taken into custody,

13  when the merchandise is recovered, we'll take the suspect back

14  to the loss prevention office where the loss prevention agents

15  will fill out various forms and trespass the suspects from the

16  property for a duration of time.

17  Q.  So if I'm understanding this right, the loss prevention

18  folks don't actually effectuate an arrest; is that correct?

19  A.  Correct.

20  Q.  They call the police?

21  A.  Correct.

22  Q.  And so the reason that there is a lookout is to make sure

23  that the police aren't coming?

24          MR. LONGSTREET:  Objection.  The prosecution is

25  testifying.

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE                    19

1          MR. DEPORRE:  I'll rephrase the question.

2          THE COURT:  You can --

3          MR. DEPORRE:  I can ask him a question.

4          THE COURT:  -- ask it in a direct exam type question.

5          MR. DEPORRE:  Certainly.

6   BY MR. DEPORRE:

7   Q.  Do Meijer loss prevention folks call the -- do they

8   effectuate arrests?

9   A.  They do not.

10  Q.  What do they do instead?

11  A.  They contact the police and we effectuate the arrest.

12  Q.  And what then is the importance of having a lookout in the

13  parking lot?

14  A.  Based on information I've gathered from interviews --

15          MR. LONGSTREET:  I'm going to object to foundation,

16  lack of a proper foundation to elicit this testimony.

17          THE COURT:  He was about -- he was literally in the

18  middle of giving the foundation.

19          MR. LONGSTREET:  Very well.

20          THE WITNESS:  I've arrested and interviewed numerous

21  retail fraud suspects using this mode of operation, and have

22  expressed to me that the person that's out in the parking lot

23  is intended to look out for police if police show up.

24  BY MR. DEPORRE:

25  Q.  And is that true at both Meijer locations?

1    A.  Yes, and Home Depot as well.

2    Q.  Now, you mentioned very briefly that on occasion, people

3    that are committing shoplifting offense have drug addictions.

4    Is that also your experience based on those investigations that

5    you've conducted?

6    A.  Yes.

7    Q.  I want to ask you specifically about the meeting that you

8    were at that morning and what happened Thanksgiving morning

9    back 2020.

10          You mentioned you were meeting with a woman named

11   Jodi -- or I could be wrong.  Were you -- were you meeting with

12   somebody named Jodi Montpas?

13   A.  Yes.

14   Q.  And is that a man or woman?

15   A.  Woman.

16   Q.  What's her role at Meijer?

17   A.  I believe her title is Loss Prevention Team Lead.  She's

18   the, the head loss prevention agent for Meijer at that store

19   location.

20   Q.  While you were meeting with Ms. Montpas -- and for the

21   record, is that spelled M-O-N-T-P-A-S?

22   A.  Without looking, I believe that sounds correct, yes.

23   Q.  Her first name, Jodi, is J-O-D-Y?

24   A.  I don't know.

25   Q.  Okay.  While you were meeting with Ms. Montpas talking

1   about a prior shoplifting incident, what happened?

2   A.  Ms. Montpas, I received information that there was another

3   person unrelated to the retail fraud that we were there to

4   speak to her about, that that other person was observed in the

5   store concealing items.

6   Q.  And specifically how did she receive that information; if

7   you know?

8   A.  I don't know.  It's electronically.  It's either a radio or

9   a store phone that she can communicate with other employees.

10  Q.  And did she relay any of that information to you and to

11  Sergeant Johnson?

12  A.  She said, we have another person stealing right now, is

13  very close to her exact words.

14  Q.  And what did you do in response?

15  A.  Since we were already on scene, we just decided we were

16  going to try to apprehend the suspect at that time on foot.

17  Q.  Did they give you a description or anything to help you

18  identify who the person was that had been stealing?

19  A.  To my recollection, the description was a white male,

20  clothing was gray, gray pants, gray shirt, gray sweatshirt.

21  Q.  And was the person -- at that time, were we in the COVID-19

22  pandemic?

23  A.  We were.

24  Q.  Do you recall whether or not people were typically wearing

25  masks, face masks in buildings?

1    A.  Yes.

2    Q.  And do you recall any information about whether the person

3    had a mask on?

4    A.  I do not specifically recall.

5    Q.  Did you -- do you recall whether or not there was a

6    description of the person's facial features?

7    A.  I do not recall any description of the facial features.

8    Q.  How about their hair, the person's hair?

9    A.  No.

10   Q.  Do you recall whether or not it was a man or a woman?

11   A.  Male.

12   Q.  Did Ms. Montpas tell you and Sergeant Johnson where the

13   person went after leaving the store?

14   A.  Well, Sergeant Johnson and I walked with Ms. Montpas toward

15   the front of the store, so it had been in a southward direction

16   through the store.

17         And at some point, we were advised that the suspect

18   had relinquished some property from a backpack to a store

19   employee and then exited the store through the west doors and

20   was walking southeastern direction through the lot.

21   Q.  Did they tell you specifically what was relinquished to the

22   store employee by the suspected shoplifter?

23   A.  I don't recall what information about the type of

24   merchandise was relayed at that time.

25   Q.  And did they tell you where the person went after

1   relinquishing some merchandise?

2   A.   Yes.   They exited the store.

3   Q.   Did they say where the person went?

4   A.   Into the lot.   Again, I don't recall if -- nobody said

5   southeastward direction, but it was more of like a pointing,

6   like they went that, he went that direction, pointed in the

7   southeastward direction from the lot to the doors.

8   Q.   Did they describe a vehicle that the people got in?

9   A.   Yes.

10  Q.   Or that the person got in, the shoplifter?

11  A.   Yes.

12  Q.   How did they describe that vehicle?

13  A.   A white Grand Prix.

14  Q.   And what did you do after getting that information?

15  A.   Sergeant Johnson and I exited the store through the west

16  doors and walked in the direction that was relayed to us that

17  the suspect went.   And as I was walking, I observed a white

18  Grand Prix at the lot.

19  Q.   What did the Meijer folks do as you walked to the front of

20  the store and outside the store?

21  A.   They did not approach the vehicle with us.   They exited the

22  store but stayed close to the building, which I believe is part

23  of their policy.   But it was one of the male employees, I don't

24  recall his name, pointed out in the specific direction of where

25  the vehicle could be located.

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE

24

```
 1    Q.  And did they tell you that they hadn't seen him actually
 2    stealing any items?
 3    A.  That information was not relayed to me.
 4    Q.  So you believe that you were pursuing someone who had
 5    shoplifted?
 6    A.  Yes.
 7    Q.  Or did you believe that you were pursuing someone who had
 8    shoplifted?
 9    A.  Yes.  The initial information when Ms. Montpas said we have
10    somebody in the store stealing right now, and then I was, as I
11    already testified, I was made aware some of the property, some
12    property was handed over to a store employee, but they did not
13    stop to allow the employee to check them or the backpack for
14    additional merchandise.
15    Q.  You mentioned a backpack.  Did you have information that
16    the person, the shoplifter, had a backpack?
17    A.  Yes.
18    Q.  And did the shoplifter leave with that backpack?
19    A.  Yes.
20    Q.  In the, I think in front of you, both you and the Court,
21    and I've given a copy to Mr. Longstreet, there is a packet and
22    some Government Exhibits that have been marked.
23            Would you flip that over and look at the first one
24    that's marked Government's Exhibit 1.
25    A.  Yes, sir.
```

1   Q.  Do you recognize that exhibit?

2   A.  Yes, it is.  Oh, I'm sorry.  It's a photograph of the white

3   Grand Prix.

4          MR. DEPORRE:  And at this point, I would move for

5   admission of Government Exhibit 1.

6          MR. LONGSTREET:  No objection from the defense.

7          THE COURT:  Okay.  That's admitted.

8      (GX 1 received, 10:15 a.m.)

9   BY MR. DEPORRE:

10  Q.  Is this the white Grand Prix that you approached after

11  receiving information from the Meijer loss prevention folks?

12  A.  Yes.

13  Q.  And do you recall what direction you approached it from?

14  A.  I approached it from the east.  This vehicle is facing

15  east, so I would have been approaching it from the rear of the

16  vehicle.

17  Q.  And once you approached the car, who did you initially make

18  contact with?

19  A.  The driver of the vehicle.

20  Q.  Did you see anybody else in the car at the time?

21  A.  Not at that time.

22  Q.  Did you ask the driver to step out of the car?

23  A.  Yes.

24  Q.  And what did you do when you asked the -- did the driver

25  comply?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE

1   A.  Yes.

2   Q.  What did you do next?

3   A.  I immediately placed the driver in handcuffs.

4   Q.  And why did you do that?

5   A.  The information I had at the time was that somebody was

6   stealing from Meijer and had gotten into a white Grand Prix.

7   Q.  And were you trying to investigate that potential crime?

8   A.  Yes.

9        THE COURT:  What was the driver of that car wearing

10  when you pulled him out of the car?

11       THE WITNESS:  I don't recall, sir.

12  BY MR. DEPORRE:

13  Q.  Do you recall whether he was wearing the clothes that

14  matched the, the description that you had gotten from the

15  Meijer loss prevention people?

16  A.  I believe that he, his clothing was not a match for the

17  description of the gray pants and the gray sweatshirt.

18  However, I would add that it's not uncommon for retail fraud

19  suspects or suspects in any crimes to either put on or take off

20  items of clothing after the crime has been committed.

21  Q.  And by that, you mean, like, do you mean that the person

22  would change their pants or a jacket or sweatshirt?

23  A.  More commonly a jacket or sweatshirt.

24  Q.  Why do shoplifters do that?

25  A.  Police are given descriptions of suspects; most criminals

1    know that.  And if they commit a crime wearing certain clothes

2    -- clothing, they may try to change their clothes or to not

3    match the description given to police.

4    Q.  Now, when you pulled the driver -- when you asked the

5    driver to exit the car and placed him in handcuffs, what did

6    you do next?

7    A.  Well, I'll answer the question.  I conducted a search of

8    the -- of his person incident to arrest.

9    Q.  And as, in your -- did you ask him whether or not he had

10   any weapons on him or anything dangerous on him?

11   A.  I don't specifically remember.  That is a question I

12   normally ask in the course of my duties when I'm conducting a

13   search.

14   Q.  Why do you ask that?

15   A.  For my own safety.  I don't want to poke myself with a

16   needle, cut myself with a knife, accidently pull the trigger of

17   a gun as I'm reaching into pockets.

18   Q.  So it's something you normally do, but you don't recall in

19   this case?

20   A.  Correct.

21   Q.  Do you normally ask suspects -- do you normally tell them,

22   advise them that you're going to search them?

23   A.  Yes.

24   Q.  And how do you go about doing that in the normal course?

25   A.  I use, I use common terms, plain language.  I don't usually

```
 1   say, "I'm going to search your pockets."  I don't use those
 2   terms.  Most of the time, I say check your pockets, or
 3   something like that.
 4   Q.  Do you ask them to check their pockets?
 5   A.  It depends on the circumstances.  In this case, I would not
 6   have.
 7   Q.  And why is that?
 8   A.  Because at the time I was making a, a probable cause arrest
 9   or detention based off of the information I was provided before
10   getting to the vehicle.
11   Q.  So you believed at that time you had probable cause to make
12   an arrest?
13   A.  Yes.
14   Q.  And what are all the things that you believed that
15   supported that probable cause?  Let's start with, if you could,
16   just go in order.
17   A.  Sure.  I had credible information from Meijer employees who
18   I have dealt with on numerous past occasions with retail fraud
19   incidents when, when they tell me they see somebody in a store
20   that's stealing, I can take them on their word that that is
21   occurring.  That is what their job is to do, is to observe and
22   detect those things.
23        So the information I had was, in my opinion, credible
24   that somebody was stealing from the store.  I did have the
25   information that some property had been concealed based on
```

1   being told that some merchandise was relinquished to a store

2   employee prior to the suspect exiting the store.  That person

3   did not allow the employee to check the backpack or the

4   person's pockets to confirm whether or not additional

5   merchandise was concealed.

6           That person exited the store and got into a white

7   Grand Prix.  This was the only white Grand Prix that I observed

8   in the area at the time.  This is where I was directed to by

9   the store employee who observed the suspect leaving the store

10  and go to the vehicle.

11          And when I approached the vehicle, there was only one

12  person that I observed at that time, that person being in the

13  driver's seat of the vehicle.

14  Q.  Now, after you pulled the driver out and searched the

15  person's pockets, did at some point you realize there was

16  another person in the car?

17  A.  I was alerted by Sergeant Johnson that there was another

18  person in the back seat of the vehicle on the -- in the rear

19  driver's side of the vehicle.

20  Q.  Was that before or after you searched Mr. Garza's pockets?

21  A.  I don't recall.  Simultaneous, probably simultaneous.

22  Q.  And were you the one who put Mr. Garza into handcuffs?

23  A.  Yes.

24  Q.  How much time elapsed from the time you put him in the

25  handcuffs until the time you searched him, searched his person?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE

30

1    A.   Immediate.  From the time I put the handcuffs on until the

2    end of the search or began the search?

3    Q.   No.  From the beginning, from the commencement of the

4    search.

5    A.   I would have applied the handcuffs and then immediately

6    gone to the search.  I, in the course of my duties, I'm not

7    going to have somebody in handcuffs and then allow them free,

8    free movement even though they are in handcuffs, because

9    somebody, if they were armed, could still produce a weapon even

10   with handcuffs on.  So I would have immediately handcuffed and

11   then gone into my search.

12   Q.   I'd like you to flip forward to what's been marked as

13   Government Exhibit 8 in that packet.  Do you recognize

14   Government's Exhibit 8?

15   A.   Yes.

16   Q.   And what is in the --

17   A.   There are, there are two photos on my page.  The top photo

18   is of several Suboxone sublingual tabs.

19   Q.   And do you know approximately how many are there?

20   A.   I don't know for sure.  There are either 17 or 19 in this

21   stack.

22   Q.   All right.  Are those the sublingual tabs the same tabs --

23   well, what -- did you take a photograph -- did you take that

24   photograph on the top --

25   A.   I did.

1    Q.  -- of Government Exhibit 8?

2    A.  I did.

3          MR. DEPORRE:  At this point, your Honor, I would move

4    for the admission of Government Exhibit 8.

5          THE COURT:  Any objection?

6          MR. LONGSTREET:  The defense doesn't believe it's

7    relevant to the issues of the search or the arrest.

8          THE COURT:  All right.  What's the theory of

9    relevance, that you discover a controlled substance on him?

10          MR. DEPORRE:  Immediately upon searching him, there

11    was a distribution quantity of Suboxone on his person.

12          THE COURT:  All right.  At this point, I'll overrule

13    the objection and let you bring it in.

14          If you want to argue in your supplemental briefs, Mr.

15    Longstreet, that this discovery that they claim they made of

16    the Suboxone doesn't support probable cause, you can certainly

17    feel free to do that.

18          MR. LONGSTREET:  Very well.

19    BY MR. DEPORRE:

20    Q.  What, if anything, did you find when you searched Mr.

21    Garza's or the driver's pockets?

22    A.  In the front right pants pocket, I located 17 Suboxone

23    sublingual tabs, tablets.  And then in his left front pants

24    pocket, I located a large amount of U.S. currency.

25    Q.  And did you ask Mr. Garza what he was doing at the store

1   that day?

2   A.  Yes.  Yeah, at some point, yes.

3   Q.  Did you talk to him?

4   A.  Yes, I did.

5   Q.  And was that after or before you realized that there was

6   another person?

7   A.  It would have been after.

8   Q.  Okay.  So when exactly, relative to finding the Suboxone,

9   if you can recall, did you realize that there was another

10  person in the car?

11  A.  I believe I was in the process of the search, already

12  searching the driver at the time that Sergeant Johnson noticed

13  another person in the vehicle.

14  Q.  And when Sergeant Johnson noticed another person in the

15  vehicle, what did Sergeant Johnson do?

16  A.  He opened up the back door where the occupant was, removed

17  him from the vehicle and placed him in handcuffs.

18  Q.  And did he search that passenger?

19  A.  Yes.

20  Q.  Did he find anything?

21  A.  I don't believe he did.

22  Q.  When he -- when the back door, when they -- when he asked

23  the passenger to step out of the back of the Grand Prix, do you

24  know if Officer Johnson saw anything suspicious in the Grand

25  Prix?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE                    33

1   A.   There was a, there was a backpack in plain view, I believe

2   multiple backpacks, actually, in the back seat where that

3   occupant was.  I do not specifically recall him relaying that

4   information to me at the time, though.

5   Q.   After Mr. Garza was out of the -- after you searched him,

6   did you ask him about the Grand Prix?

7   A.   Yes.

8   Q.   And what did you ask him?

9   A.   I would have asked whose car is this.

10  Q.   And how did he respond?

11  A.   He claimed ownership of it.

12  Q.   Did he say when he had purchased it?

13  A.   Yes, recent.  I don't recall specifically if he said how

14  long he had owned it, but I know it was recent that he said.

15  Q.   Is there anything that would refresh your recollection

16  about how he responded?

17  A.   It would be in my report.

18  Q.   Do you have a copy of your report up there?

19  A.   I do.

20        MR. DEPORRE:  Defense counsel, I'm going to ask him to

21  take a look at a copy of his report to refresh your

22  recollection.

23        MR. LONGSTREET:  To refresh his recollection?

24        MR. DEPORRE:  Do you want to see it?

25        MR. LONGSTREET:  I have a copy.

1    BY MR. DEPORRE:

2    Q.  Would you take your report out.

3    A.  Can I refresh my memory at this time?

4    Q.  Yeah.  I'd ask you to look at page 9 of your report.  In

5    the middle of the page.

6            Does that refresh your recollection?

7    A.  Yes.

8    Q.  And what did Mr. Garza tell you about the car?

9    A.  He advised me that he had recently purchased it and that he

10   had not registered it or transferred the title with the

11   Secretary of State.

12   Q.  Did Mr. Garza say anything about the Suboxone that you

13   found in his pocket?

14   A.  He did.

15   Q.  What did he tell you?

16   A.  He claimed that he had a prescription for it and stated

17   that he had 14 in, in the stack that was in his pocket; he

18   takes two a day.

19   Q.  And as you were standing there, did you immediately count

20   the Suboxone or did you just place those somewhere else?

21   A.  I would not have counted them at that time, so no.  I would

22   have placed them somewhere else.

23   Q.  Do you recall where you placed them?

24   A.  No.

25   Q.  Was your patrol car there with you at the scene where the

35

1   Grand Prix was?

2   A.   It was not.

3   Q.   So after Mr. Garza is out of the car and Mr. Hutchins is

4   out of the car and after they had both been handcuffed, what

5   did you do next?

6   A.   I returned to my patrol car and drove it around to the

7   front of the store where we were conducting our investigation.

8   Q.   And why did you do that?

9   A.   To secure at least one of the occupants in the patrol car.

10  Q.   What was your purpose in securing somebody in the patrol

11  car?

12  A.   To, to conduct our investigation efficiently.  We can't

13  worry about keeping an eye on, on subjects, making sure they

14  are not trying to run away or anything like that.  So to secure

15  them in the back of the patrol car ensures they can't get out

16  and I can focus my attention elsewhere.

17  Q.   At the time, were your patrol cars equipped with a dash

18  camera?

19  A.   No.

20  Q.   And were you equipped with a body camera at that time?

21  A.   No.

22  Q.   Has that, in some regards, changed since then?

23  A.   Yes.

24  Q.   And explain how.

25  A.   Recently, within the last, within the last three months, my

```
 1   department has equipped our patrol cars with dash cameras.  We
 2   have body-worn microphones.  We do not have body cameras still.
 3   Q.  Did your car have an in-car computer?
 4   A.  Yes.
 5   Q.  And did you need that computer for anything?
 6   A.  For running, running LEIN checks, Secretary of State
 7   checks, yes.
 8   Q.  What were you going to run a LEIN check or a Secretary of
 9   State check of?
10   A.  Any time I have law enforcement interaction with a subject,
11   I perform a LEIN, SOS checks, check for license statuses,
12   warrants.
13   Q.  Once you put Mr. Garza in your vehicle -- or who did you
14   put in your patrol car?
15   A.  Mr. Garza.
16   Q.  And while, while you were doing that, what was Sergeant
17   Johnson doing?
18   A.  He was still standing next to the white Grand Prix with Mr.
19   Hutchins who was in, in handcuffs.
20   Q.  And that was the passenger?
21   A.  Yes.
22   Q.  And Garza was the driver?
23   A.  Yes.
24   Q.  Did Garza at some point identify himself?
25   A.  Yes.
```

1   Q.   And did Hutchins identify himself?

2   A.   Yes.

3   Q.   Did Sergeant Johnson speak with Mr. Hutchins?

4   A.   Yes, he did.

5   Q.   And what did Mr. Hutchins tell Sergeant Johnson?

6           MR. LONGSTREET:  I'm going to object to the question.

7   It calls for hearsay.

8           THE COURT:  Overruled.  Go ahead.

9   BY MR. DEPORRE:

10  Q.   Do you want me to repeat the question?

11  A.   No.  I'm okay.

12          The, the statements that were relevant, I was present

13  for.  What he said to Sergeant Johnson, while I wasn't there, I

14  don't, I don't know.  But I was present for Mr. Hutchins

15  telling both Sergeant Johnson and I that he would like to speak

16  with us.  And this was after Mr. Garza was already secured in

17  my patrol car and out of earshot.  He admitted that he was

18  stealing from the store, and that he had merchandise still in

19  the backpack in the vehicle.  He identified Mr. Garza as a drug

20  dealer and stated there was a firearm in the white Grand Prix.

21  Q.   Did he talk about anybody else being involved in

22  shoplifting?

23  A.   Yes.

24  Q.   What did he tell you?

25  A.   He said that there was a third suspect in the store that

1    was also stealing.  And he gave a description of that person as

2    well.

3    Q.   Do you recall the description he gave you?

4    A.   I know that one of the clothing items he described was a

5    gray hat.

6    Q.   What, if anything, did you do next after getting this

7    information?

8    A.   I don't recall at what point this occurred, but at some

9    point Officer Davies, who is another Metro Police officer

10   working at the time, she was called to the scene in her patrol

11   car.  And when she arrived, Mr. Hutchins was secured in Officer

12   Davies' patrol car.  Sergeant Johnson and I re-entered Meijer

13   through the east doors in an attempt to locate the third

14   suspect.

15   Q.   Where is Metro Police Authority office located?

16   A.   It is, it's the building right next door to Meijer.

17   Q.   So upon calling Officer Davies, how long would it take her

18   to get to Meijer?

19   A.   If she was at the office, it would have been less than,

20   less than a minute.  But I don't recall if she was at the

21   office or out on patrol.

22   Q.   Once Officer Davies arrives, what do you do next?

23   A.   Secured Mr. Hutchins in her patrol car.

24   Q.   And after he is secured, what do you do next?

25   A.   Sergeant Johnson and I entered the east doors of Meijer and

```
1   gave a description of the third suspect to one of the Meijer
2   employees.  I don't recall if it was a general employee or a
3   loss prevention employee, but they were able to relay, whoever
4   it was relayed information to other employees in the store to
5   be on the lookout for the third suspect.
6   Q.  And just as a reminder to me, the east door, is that the
7   door that you originally entered when you met with the loss
8   prevention folks?
9   A.  No.
10  Q.  Is the east door the main door to Meijer?
11  A.  It -- yes.  It is the, on the -- the sign above it, it says
12  "fresh."  It's the grocery side of Meijer.
13  Q.  So it's on the south portion of the store, but it's the
14  door furthest to the east; is that?
15  A.  Yes, that's, that's correct.
16  Q.  And is there a door on the west?
17  A.  There is.
18  Q.  But also on the south portion of the store?
19  A.  There is.  Yes, that's correct.
20  Q.  Do you know what it says over that door?
21  A.  "Home."
22  Q.  When you went into the front entrance, the "fresh" front
23  entrance of Meijer, did you eventually find Mr. -- the other
24  shoplifter?
25  A.  Yes.
```

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE

40

1  Q.  And what did you do?

2  A.  He was also taken into custody, handcuffed, searched.  He

3  had merchandise on his person as well.

4  Q.  And did you bring him out to the parking lot?

5  A.  Yes.

6  Q.  What, what happened next?

7  A.  The third suspect was secured in Sergeant Johnson's patrol

8  car.  And at that point, I began conducting an inventory search

9  of the suspect vehicle -- inventory and probable cause search

10  of the suspect vehicle.

11  Q.  And what you were looking for in the suspect vehicle?

12  A.  Evidence of the retail fraud, the original reason for the

13  interaction.  And since I had already located the, the Suboxone

14  strips, I was also looking for evidence of and, excuse me, the

15  Suboxone strips and the statement made by Hutchins that Mr.

16  Garza was a drug dealer and that there was a gun in the car.

17  So I was looking for merchandise, drugs, and a gun.

18  Q.  And I'd like you to turn in those exhibits to Government's

19  Exhibit 2.

20       Could you describe -- there are two photos depicted on

21  Government Exhibit 2.  Could you describe what they are of,

22  what they depict starting with the top one.

23  A.  These are photos of the interior of the white Grand Prix.

24  The top photo is looking in from the driver's side of the

25  vehicle in the back seat toward the passenger side.

1    Q.  And what do you see in the bottom photo?

2    A.  The bottom photo is taken from the same location, just at a

3    different angle, pointed down toward the floorboard.  It's

4    difficult to see in with this quality on this paper, but there

5    is a brass colored object, it's in the center of the photo.

6    That is a live round of 9 millimeter ammunition that I located

7    during the search.

8    Q.  Now, did you take these photographs?

9    A.  I did.

10            MR. DEPORRE:  Your Honor, I'd move for admission of

11   Government Exhibit 2.

12            MR. LONGSTREET:  No objection.

13            THE COURT:  It's admitted.

14        (GX 2 received, 10:41 a.m.)

15   BY MR. DEPORRE:

16   Q.  I'd like to direct your attention now to Government Exhibit

17   3, specifically the top photo.  Could you describe that for the

18   Court?

19   A.  This is a, a closer I guess zoomed-in photo of the same

20   item that was on the bottom photo of Exhibit No. 2.

21   Q.  That's the -- is that a 9 millimeter live round of

22   ammunition?

23   A.  It is.

24            MR. DEPORRE:  I'd move for admission of Government

25   Exhibit 3.

1          MR. LONGSTREET:  No objection.

2          THE COURT:  It's admitted.

3      (GX 3 received, 10:42 a.m.)

4  BY MR. DEPORRE:

5  Q.  Can you take a look at Government Exhibit 4.

6          MR. LONGSTREET:  For purposes of judicial economy, the

7  defense will respectfully stipulate to the admission of

8  Government Exhibit 4, and 5, 6, 7 and 8.

9          THE COURT:  Thank you.  I appreciate that.  Those will

10  be admitted.

11      (GX 4-8 received, 10:42 a.m.)

12  BY MR. DEPORRE:

13  Q.  Could you describe where Government Exhibit 4 is.

14  A.  The top photo is in the back seat area in this, this

15  central part of the vehicle in the back seat.

16  Q.  And what are those gloves there?

17  A.  That is a pair of Franklin batting gloves; that is

18  merchandise from Meijer.

19  Q.  All right.  Government's Exhibit 5, the top photo, please

20  explain where that photo was taken and what's it of.

21  A.  Took it from, sir, you said Exhibit 5, top photo?

22  Q.  Yes, sir.

23  A.  Okay.  That is a photo taken of the contents of an Easton

24  backpack that was located in the back seat of the white Grand

25  Prix.  The items in the photo are merchandise from Meijer.

1   Q.   Now, I direct your attention to the bottom photo of

2   Government Exhibit 6.  What's that a photograph of?

3   A.   It's a photograph of the open trunk of the white Grand

4   Prix.

5   Q.   And why did you search the trunk of the Grand Prix?

6   A.   It's an area where items could be concealed, illegal items,

7   anything.  During an inventory, I have to search all

8   compartments anyway.

9   Q.   Could there have been drug paraphernalia in the trunk?

10           MR. LONGSTREET:  Objection.  Leading.

11           THE COURT:  Overruled.

12           THE WITNESS:  Yes.  Drug paraphernalia could be in the

13   trunk, firearms could be in the trunk.  Evidence of any other

14   crimes I was investigating could have been located in the

15   trunk.

16   BY MR. DEPORRE:

17   Q.   And in the car, did you find any drugs?

18   A.   I did.

19   Q.   What types?

20   A.   I found methamphetamine and I found additional Suboxone

21   sublingual tabs, and marijuana.

22   Q.   In the trunk there, I'd like to you take a look at

23   Government Exhibit 7, there is an orange bucket.  And I direct

24   your attention to the objects inside the bucket.  Do you

25   recognize what those are?

1    A.  Yes.

2    Q.  What are they?

3    A.  Butane.

4    Q.  Do you know why there is a bucket full of butane in the

5    back of this man's car?

6            MR. LONGSTREET:  Calls for speculation.

7            THE COURT:  I'll sustain that.

8    BY MR. DEPORRE:

9    Q.  Are you familiar with the manufacture of marijuana wax?

10   A.  I am.

11   Q.  And based on your training and experience, is butane used

12   to manufacture marijuana wax?

13   A.  It is.

14           MR. LONGSTREET:  Objection to relevance.

15           THE COURT:  Overruled.  Go ahead.

16           THE WITNESS:  It is.

17   BY MR. DEPORRE:

18   Q.  Based on that, were you able to draw any conclusions why

19   there were numerous cans of butane in the back of the car?

20   A.  Based on the marijuana in the vehicle and the butane being

21   in the trunk, I suspected that it was being used to manufacture

22   THC wax.

23   Q.  And then going over to Government's Exhibit 8, the bottom

24   photograph there, what is that photograph of?

25   A.  It's a digital scale.

1    Q.  And where did you seize that from?

2    A.  I would have to refresh my recollection.

3    Q.  All right.  I'd ask you to do that.

4            Just for the record, what are you using to refresh

5    your recollection?

6    A.  This is my police report.

7    Q.  All right.  And would you go ahead and take a look at it?

8            I'd ask you to take a look specifically at the very

9    bottom line of page 9 of 12 of your report.

10           Does that refresh your recollection as to where you

11   recovered that digital scale?

12   A.  It does.

13   Q.  Where did you recover it?

14   A.  In the vehicle's center console, the armrest.

15   Q.  You mentioned you found some methamphetamine in the car.

16   Where was that located?

17   A.  There was a metal tray.  When I first had contact with the

18   driver, I opened the driver's door, I observed it.  It was

19   between the driver's seat and the jam of the driver's door.  I

20   located the methamphetamine in that metal tray.

21   Q.  And is it, is that something you had seen before, a metal

22   tray?

23   A.  Yes.

24   Q.  What's the purpose of a metal tray with respect to drug

25   use?  Or drug, drug activity?

1  A.   Sure.  This type of metal tray has, they have magnetic top

2  lid.  And they are commonly sold in head shops, gas stations

3  alongside pipes, rolling papers, and it's very common to find

4  them to contain drugs.

5  Q.   What kind, typically?

6  A.   Various kinds, most often marijuana.

7  Q.   What are digital scales typically used for with respect to

8  drug activity?

9  A.   Weighing of -- weighing of narcotics.

10 Q.   Did you find any syringes in the car?

11 A.   I did.

12 Q.   What is a syringe typically used for?

13 A.   Intravenous drug use.

14 Q.   When you searched Mr. Allen back at Meijer, did you find

15 any syringes on his person?

16 A.   Yes.

17 Q.   And what did you do with those?

18 A.   The syringes were used, so there is some biohazard concern.

19 They are -- they were empty so they don't hold much evidentiary

20 value.  And labs, the State Police crime lab doesn't accept

21 them because of the biohazard concern.  So because they have

22 very little evidentiary value, they were disposed of properly

23 within a Sharps container.

24 Q.   What did you do after you searched Mr. -- the white Grand

25 Prix?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - DIRECT BY MR. DEPORRE                    47

1   A.  The vehicle was towed from the scene.

2   Q.  And at some point, do you recall whether or not you

3   contacted a tow company?  Or how was that arrangement made; if

4   you recall?

5   A.  Tow companies are requested through our dispatch, so I

6   would have just -- I don't know if it was me.  One of the

7   officers on scene would have requested a tow truck through

8   dispatch.

9   Q.  And prior to towing the car, had somebody run the car in

10  LEIN?

11  A.  Yes.

12  Q.  And who was that?

13  A.  Officer Davies.

14  Q.  And what, if anything, did she tell you about that car?

15  A.  The registration plate on the vehicle was not associated

16  with that vehicle.  It was an improper plate.

17  Q.  Based on that, would it have been legal for that car to

18  leave the Meijer parking lot?

19  A.  No.

20  Q.  And are you familiar with any policies that Meijer has with

21  respect to un -- vehicles that have improper plates parked at

22  its store?

23          MR. LONGSTREET:  Objection.  Cumulative.  We covered

24  this earlier.

25          THE COURT:  I'm sorry?

UNITED STATES vs. GARZA - 21-20405

1     MR. LONGSTREET:  Cumulative evidence.

2     THE COURT:  I thought that Mr. DePorre was explaining

3  it to me when I asked him, but I don't recall this officer --

4     MR. LONGSTREET:  Oh, very well.  Very well.

5     THE COURT:  -- talking about it.

6     THE WITNESS:  The question again, sir?

7  BY MR. DEPORRE:

8  Q.  Does Meijer have any policies with respect to cars parked

9  in its parking lot that have improper plates or cannot

10 otherwise be lawfully driven?

11 A.  There is an agreement between the Metro Police Authority

12 and the Meijer stores that if there are vehicles that are not

13 legally registered in the lot, and if that is discovered, that

14 they would have us remove those vehicles.  They don't want

15 those vehicles left in their lot unoccupied.

16 Q.  At some point, did you do a criminal history search for Noe

17 Garza?

18 A.  Yes, I did.  Yes.

19 Q.  And do you recall, was that before or after you searched

20 the car?

21 A.  That would have been after.

22 Q.  Do you recall what time you did that search?

23 A.  I do not.

24 Q.  Is there anything that would refresh -- oh, have you done

25 anything within the last 24 hours to determine when you did a

| | |
|---|---|
| 1 | search of Mr. Garza? |
| 2 | A.  No, sir.  I just wanted to point out specifically you asked |
| 3 | about his criminal history. |
| 4 | Q.  Oh, I'm sorry.  Did you do a LEIN search?  I should |
| 5 | rephrase that.  Did you search Mr. Garza in LEIN? |
| 6 | A.  I did. |
| 7 | Q.  And does LEIN contain information about a person's -- |
| 8 | whether or not they have prior criminal convictions? |
| 9 | A.  Yes. |
| 10 | Q.  Does it also contain information about whether or not they |
| 11 | have active warrants? |
| 12 | A.  Yes. |
| 13 | Q.  And did you run Mr. Garza in LEIN? |
| 14 | A.  Yes. |
| 15 | Q.  Do you recall when you ran him in LEIN? |
| 16 | A.  10:34 a.m. |
| 17 | Q.  And was that before or after the vehicle search? |
| 18 | A.  That was after. |
| 19 | Q.  What, if anything, did you find out when you ran him in |
| 20 | LEIN? |
| 21 | A.  He had active warrants for his arrest. |
| 22 | Q.  All right.  I'm going to ask you to take a look at |
| 23 | Government's Exhibit 9. |
| 24 | MR. LONGSTREET:  Objection.  Lack of a proper |
| 25 | foundation.  This information will be coming in as hearsay. |

1   This person is not a keeper of the record.  This is not a

2   certified document.  He cannot testify to this document in any

3   way, shape or form.

4         THE COURT:  I'll let you try to lay a foundation.  You

5   can see where you can --

6         MR. DEPORRE:  And I would just point out that under

7   104, the Rules of Evidence don't apply.  So this is a document

8   that -- it's a bench warrant.  I'm going to ask if he has

9   general familiarity with the bench warrant and whether or not

10  these warrants were recorded on LEIN.  But I'm not going to try

11  and authenticate the document by any means through the witness

12  today, nor do I think that the rules require me to do so.

13        THE COURT:  Is there any reason not just to go to

14  Exhibit 12 and ask if that's the LEIN report he ran that showed

15  the warrants?  Or is that not --

16        MR. DEPORRE:  I don't think that's what that is.

17  BY MR. DEPORRE:

18  Q.  When you ran Mr. Garza, did you see warrants from two

19  different jurisdictions?

20  A.  Yes.

21  Q.  And did you go -- did you eventually seek a paper copy of

22  those warrants or did you rely on the information in LEIN in

23  determining whether or not Mr. Garza had warrants?

24  A.  I did not obtain paper copies.  It's not standard practice

25  in Genesee County anyway to do that.

1    Q.  Did you determine, based on your review of LEIN, that Mr.

2    Garza had a warrant out of Oakland County?

3    A.  Yes.

4    Q.  And did you also determine based on your review of LEIN

5    that Mr. Garza had a bench warrant out of the Genesee County in

6    the 67th District Court?

7    A.  Yes.

8            THE COURT:  Let me just interrupt for a second here.

9            Mr. Longstreet, if you want to contest the existence

10   of the warrants, that's fine.  But I want to make sure that if

11   you're going to take that position, I'd certainly give Mr.

12   DePorre an opportunity to call the keeper of the records from

13   the Oakland Circuit Court and the 67th District Court.  So do

14   you want to contest the existence of the warrants?

15           MR. LONGSTREET:  I'm not contesting the accuracy of

16   the warrants.  However, I do to --

17           THE COURT:  Can you take off your mask?  I'm sorry.  I

18   can't hear you.

19           MR. LONGSTREET:  I said I have no issue in regards to

20   the legitimacy of the warrant.  It's just my job as defense

21   counsel to ensure that the Government is presenting evidence in

22   the manner that's proper.  Therefore, I believe that the way

23   they are trying to present this particular warrant in its

24   fashion is improper as they don't have the proper foundation.

25   It's hearsay.  He's not the keeper of record.  There is no --

52

1        THE COURT:  Listen.  What I'm saying is --

2        MR. LONGSTREET:  Sorry.

3        THE COURT:  -- you certainly have every right to make

4   that objection.  It's your choice whether to make the

5   objection.  Sometimes defense lawyers would choose maybe not to

6   make an objection if ultimately it was easily curable on a

7   point that is really undisputed.

8        If you want to make that objection and you want me to

9   sustain it, I will continue this hearing and Mr. DePorre can

10  call the keeper of the records of the Oakland Circuit Court and

11  the 67th District Court if you want to persist in that

12  objection, which is fine with me, and if, if Mr. DePorre

13  chooses to do it.  Ultimately, I don't know that it really

14  matters, but do you want to persist in that objection?  It's

15  fine if you do.

16       MR. LONGSTREET:  I am not challenging the legitimacy

17  of the warrants, just the manner in which they are being

18  presented in evidence.

19       THE COURT:  For purposes of this hearing, are you

20  stipulating that on the date that, I think it was November 26,

21  2020, that there were at least two bench warrants that had been

22  issued for Mr. Garza and entered into LEIN?  Do you stipulate

23  to that?

24       MR. LONGSTREET:  I can if I have a certified copy of

25  the document.

1              THE COURT:  Okay.  Go ahead, Mr. DePorre.

2    BY MR. DEPORRE:

3    Q.  Do you know if you ran LEIN at the Meijer location or did

4    you run the LEIN check of Mr. Garza at the Metro Police

5    Authority station?

6    A.  I don't recall.  The LEIN was run in my in-car computer,

7    but I don't know if I had returned to the office already.

8    Q.  And at some point, you did return to the office?

9    A.  Yes.

10   Q.  How many people from this event were in custody at that

11   point?

12   A.  Three.

13   Q.  Who were they?

14   A.  Noe Garza, Meldrum Allen, and Robert Hutchins.

15   Q.  And what did you do after you returned to the office?

16   A.  I conducted interviews with all three of the subjects.

17   Q.  What did Robert Hutchins tell you during the interview?

18   A.  Mr. Hutchins explained to me that he had purchased heroin

19   from Mr. Garza earlier in the morning, and that Mr. Allen, who

20   is also a drug user and owed money to Mr. Garza for drugs.

21              Mr. Allen and Mr. Hutchins were together at a

22   residence prior to being driven to Meijer.  And Mr. Allen was

23   supposed to go to Meijer to steal items as payment to Mr.

24   Garza.  And Mr. Hutchins went along with the intention of

25   stealing items in order to pay for additional heroin.  He also

1    advised me that he had seen Mr. Garza in physical possession of

2    a weapon prior to arriving at Meijer.

3    Q.  Did you also interview Mr. Allen?

4    A.  I did.

5    Q.  And for both Mr. Allen and Mr. Garza, did you advise them

6    of *Miranda* rights?

7    A.  I did.

8    Q.  Did they waive those rights?

9    A.  They did.

10   Q.  And for Mr. Hutchins also?

11   A.  Both.  All three --

12   Q.  Sorry.  Hutchins, Allen, Garza, did you read all of them

13   *Miranda* rights?

14   A.  I personally did, yes.

15   Q.  And did they all waive *Miranda* rights?

16   A.  Yes.

17   Q.  What did Mr. Allen tell you during the interview?

18   A.  Mr. Allen acknowledged that he was a heroin user in the

19   amount of approximately 2 grams per day use.  He denied owing

20   money to Mr. Garza.

21        He claimed that he came to Meijer to shop for food and

22   originally did not have an intention to steal, but admitted

23   that some time while he was in the store, he decided to steal

24   from the store.  And that he had concealed merchandise but then

25   at some point realized he was being followed by store

1    employees, so he removed the items from his pockets and from

2    his cart.

3            I asked him about the gun, if anybody in the car had a

4    gun.  He claimed that he didn't see anybody with one.  He

5    suggested that Mr. Garza might have had one and said that, when

6    I asked where, where that gun might be, he said he observed Mr.

7    Garza prior to leaving to come to Meijer open the hood of the

8    car and put something in the engine compartment and said that

9    it may have been a gun.

10   Q.  And did you also speak with Mr. Garza?

11   A.  I did.

12   Q.  What did Mr. Garza tell you when you asked him about a

13   firearm?

14   A.  He denied being in possession of a firearm.

15   Q.  Did you ask him about the ammunition that you found in the

16   car?

17   A.  Yes, I did.

18   Q.  And what was his explanation for there being a 9 millimeter

19   round in the car?  If you recall.

20   A.  I'm not confident in my recollection enough to answer that

21   right now.  I could refresh my recollection from my report

22   possibly.

23   Q.  You can take a look at your report to try and refresh your

24   recollection.

25           I direct you to page 11 of 12, sort of midway through

1   the page there.

2          And did you ask him about what the 9 millimeter round

3   of ammunition?

4   A.  I did.

5   Q.  And do you remember what he said?

6   A.  He denied knowledge of the round of the ammunition being in

7   the vehicle.

8   Q.  Do you know the name of the tow company that towed the

9   Grand Prix?

10  A.  Yes.

11  Q.  What is it?

12  A.  Alexander's Towing.

13  Q.  And do you know where they towed it to?

14  A.  To their tow yard.

15  Q.  Where is that located?

16  A.  It is on Reid Road -- excuse me.  It's on Cook Road in

17  Mundy Township.

18  Q.  And is it a secured lot?  Is it an enclosed warehouse?

19  Could you describe what the impound lot is like?

20  A.  Alexander's Towing is what I would describe as kind of a

21  mom and pop operation.  They operate on their property where

22  they reside.  There is no fences.  It's vehicles towed to

23  their, their lot are just kept in their, in their yard.

24  Q.  And if the vehicle is towed unlocked, do you know if it

25  stays in that condition?

```
 1   A.   It's -- I don't know specifically what their, what their
 2   policies are as a, as a company.  I do know that they have been
 3   known at Alexander's to leave vehicles unlocked.
 4   Q.   And how do you know that?
 5   A.   From other officers at the department, just discussions
 6   about the different tow companies and issues with one versus
 7   the other.
 8   Q.   Have you ever had an issue where something is stolen from
 9   the tow lot at Alexander's?
10   A.   There have been claims of that, reports of that.  The facts
11   of those cases I'm not aware of, but they are, nonetheless,
12   they are claims that have been made in the past.
13   Q.   And you know that based on discussions with other officers?
14   A.   Yes.
15   Q.   But you personally have never gone to Alexander's to
16   investigate a larceny from a vehicle?
17   A.   No.
18   Q.   After you received the information from the interviews that
19   you had conducted, what did you do next?
20   A.   With the information that the gun -- a gun might be in the
21   engine compartment of the car, and knowing how Alexander's lot
22   is unsecured, the vehicles have been known to be left unlocked,
23   it's obviously a concern that there was an unattended,
24   potentially unattended firearm in unknown condition as far as
25   being loaded or not, that really anybody could have access to.
```

1   Q.   So what did you do?

2   A.   Myself and Officer Graholsk (ph), who is another Metro

3   Police Authority officer, we went to Alexander's where we found

4   the vehicle in the yard, unlocked.  And we -- I opened the --

5   unlatched the hood and Officer Graholsky was the one that

6   ultimately located a firearm in a mesh bag that was concealed

7   behind the vehicle's battery.

8   Q.   I want to ask you a question about, like a "what if"

9   hypothetical question.

10          If you had arrived on scene and not seen Noe Garza on

11   scene, say he wasn't in the driver's seat in the car when you

12   first approached it, would you have towed that Grand Prix from

13   the Meijer parking lot?

14   A.   I think this is -- I think would have and could have are

15   two different things.

16          Could have?  The answer would be yes.  Would have?  It

17   would depend on -- it's a discretionary question.  It's not --

18   it wouldn't be common, especially this case where I had

19   ultimately bigger fish to fry.  I was engaged in an

20   investigation.  It's not something I would have prioritized.

21   Could it have been done from a legal standpoint?  Yes.

22   Q.   Well, let me maybe ask it with a -- put a finer point on

23   the question.  If only Mr. Hutchins had been in that car and

24   not Mr. Garza, would you have still searched the Grand Prix?

25   A.   Yes.

1   Q.  And if you had searched the Grand Prix and found the items

2   that you found, would you then have towed the Grand Prix?

3   A.  Yes.

4   Q.  Why?  Why would you have searched it?

5   A.  The probable cause for the potential for locating

6   merchandise would have still existed, so that probable cause

7   search would have still have been conducted.  It was -- it's

8   common practice when we, as an agency, investigate these retail

9   fraud incidents, that that's what is done.  We locate the

10  suspects and recover merchandise and tow the vehicle from the

11  lot.

12  Q.  So you still would have searched the backpack in the Grand

13  Prix?

14  A.  Yes.

15  Q.  And would you still have found the stolen merchandise?

16  A.  Yes.

17  Q.  And then would you have found other drug paraphernalia

18  during your search?

19  A.  Yes.

20  Q.  Then what would you have done after finding those things?

21  A.  Tow the vehicle.

22  Q.  Why?

23  A.  To be impounded based on the -- I guess multiple reasons.

24  It's not legal to be driven from the scene.  It's got an

25  improper plate on it.  And the suspects are taken into custody

1    for retail fraud.

2            MR. DEPORRE:  I have no more questions for Officer

3    Fisher at this point.

4            THE COURT:  Let's take about a 10-minute comfort

5    break.  We've been going for quite awhile.  So adjourn for ten

6    minutes and then resume.

7            THE CLERK:  All rise.

8        (Recess taken, 11:14 a.m. - 11:24 a.m.)

9            THE CLERK:  All rise.

10           THE COURT:  Please be seated.

11           Mr. Longstreet, how about some cross-examination?

12           MR. LONGSTREET:  Thank you.

13           THE COURT:  Do you mind taking off your mask while

14   you're asking questions?

15           MR. LONGSTREET:  No problem whatsoever, sir.

16           THE COURT:  I don't want you to feel uncomfortable.

17   Some people might.  Are you comfortable taking it off?

18           MR. LONGSTREET:  Either way.  I'm fine.  I got all

19   three shots, I'm got a mask, I'm good to go.

20           THE COURT:  Let it rip.

21           MR. LONGSTREET:  Thank you, sir.

22                        CROSS-EXAMINATION

23   BY MR. LONGSTREET:

24   Q.  Good morning, Officer.

25   A.  Good morning.

1    Q.  Officer, first, I would like to direct your attention in

2    regards to the police reports you drafted on this particular

3    day.  You did draft a police report, correct?

4    A.  I did.

5    Q.  And the police report is a synopsis of everything that

6    occurred on 11/26/2020?

7    A.  Correct.

8    Q.  And is a full synopsis of your investigation?

9    A.  Yes.

10   Q.  And it's full and accurate and complete as in regards to

11   the information or the things that occurred on that particular

12   day, correct?

13   A.  Correct.

14   Q.  All right.  Now, on this particular day, referring to page

15   3 of your -- of your, excuse me, page 2 of your report, second

16   paragraph where it indicates, "arrestee:  Noe Garza."  Do you

17   see that, sir?

18   A.  I just want to make sure I'm --

19   Q.  Page 2, top of the page, "arrestee:  Noe Garza"?

20   A.  Sure.  Just so you know, you're talking about his -- this

21   just data format screen right here?

22   Q.  I'm referring to your police report.  I'm referring to page

23   2 of what's titled page 2 of 12 of your case report.  I'm

24   referring to the paragraph or the portion of your report that

25   indicates, "arrestee:  Garza, Noe."  Do you see that, sir?

MOTION HEARING - 12/21/2021
OFFICER STEVEN FISHER - CROSS BY MR. LONGSTREET                    62

 1  A.  I do, yes, sir.

 2  Q.  All right.  Thank you.

 3          And, sir, you have listed to the left in a column the

 4  arrested for offenses; is that correct?

 5  A.  On the right side, yes.

 6  Q.  Yes.  And on that right side of this document, it indicates

 7  a number of criminal charges you suspect that Mr. Garza --

 8          THE COURT:  Mr. Longstreet, do you mind hanging near

 9  the, microphone?  I want to make sure I'm hear everything you

10  say.  When you're pointing away, I'm losing you a little bit.

11          MR. LONGSTREET:  Very well.

12          THE COURT:  It's probably my old age.

13          MR. LONGSTREET:  Very well.

14          THE COURT:  Thank you.

15  BY MR. LONGSTREET:

16  Q.  And, sir, in this particular report, it indicates the

17  offenses for which you arrested Mr. Garza, correct?

18  A.  Some of them, yes.

19  Q.  Okay.  But in this particular list of arrest offenses, none

20  of them is shoplifting, correct, sir?

21  A.  No, sir.  The --

22  Q.  Thank you.

23  A.  No.  No.

24  Q.  No.  Thank you.

25  A.  No.  I think you're misinterpreting my response.

1              It lists organized retail fraud.  It also says on

2     here, and as a continuation of that, conspiracy to commit an

3     organized retail crime.  That is --

4     Q.  Excuse me.

5     A.  -- what colloquially would be called --

6     Q.  Sir, I'm looking at page 2 of your report.  And I didn't

7     ask you to add any information, just only what I asked you.

8     And it indicates in this "arrest for" box, it lists a number of

9     things, but out of those number of things, none of them

10    includes shoplifting; yes or no?

11    A.  Sir, yes, it does.

12    Q.   In this particular box, on the right-hand side of this

13    document --

14             THE COURT:  Does anybody have an extra copy of this?

15    There's no jury here.  Let me just see the damn documents.

16             MR. LONGSTREET:  May I approach?

17             THE COURT:  Does anybody have an extra copy for me?

18             MR. LONGSTREET:  It's my only copy, but --

19             MR. DEPORRE:  We could very -- the officer has the

20    report.  I think the easiest thing would be just have the Court

21    look at it, or to make a copy of it.

22             THE CLERK:  Do you want me to make a copy for you?

23             THE COURT:  Okay.  The box says organized retail

24    fraud.

25             MR. LONGSTREET:  I must be looking at a different

1   document, because I'm looking at "arrested for methamphetamine,

2   synthetic marijuana and firearms."

3          THE COURT:  Can you come up here, Mr. Longstreet?

4          MR. LONGSTREET:  Yes, I can, sir.

5          MR. DEPORRE:  Can we side bar, your Honor?

6     (Side bar discussion held with counsel off the record,

7     11:34 - 11:35 a.m.)

8          THE COURT:  Hold on.  Let's go back on the record for

9   a second.

10         Mr. Longstreet, we had a divergence there.  The report

11  that you have, I thought you were missing something that was

12  obvious, and you showed me your report and it wasn't in there.

13  And then the officer showed me his report, and it was in there.

14         And at side bar, what we discovered, and I want the

15  record to be clear on this, is that the police report that you

16  have been given, Mr. Longstreet, indicates that it was printed

17  on December 1.  The police report that Officer Fisher is

18  referring to and has been using to refresh his recollection

19  looks like it was printed on December 20th.

20         MR. DEPORRE:  And just so I can supplement that

21  record, the copy that Mr. Longstreet and I have was printed on

22  December 1 of 2020.  So this is over a year, that the copy that

23  the witness has was printed over a year later.

24         THE COURT:  Okay.  Whenever it was printed, it looks

25  to me as if Mr. Longstreet doesn't have it; is that correct?

1    MR. LONGSTREET:  I do not have it.

2    THE COURT:  All right.  So let's stop for a second and

3    figure out what we should do.  It seems to me, Mr. Longstreet,

4    that it's appropriate for you to have that document.

5    MR. LONGSTREET:  It is.

6    THE COURT:  And to have it in advance to prepare to

7    cross-examine this witness.

8    MR. LONGSTREET:  Yes.

9    THE COURT:  So one option is you can continue.  The

10    other option is we can adjourn.  You guys can straighten out

11    the documents to make sure that you have everything, and then

12    we can reconvene once you've had a chance to review the updated

13    report.

14    MR. LONGSTREET:  May I briefly review it?

15    THE COURT:  Sure.  Yes.

16    MR. LONGSTREET:  Thank you.

17    THE COURT:  That's another option, if it's not that

18    long and you feel comfortable.

19    MR. LONGSTREET:  It's not that long.

20    THE COURT:  But look, here is the main thing, Mr.

21    Longstreet.  This is kind of a blip.  And I want to be sure

22    that you are comfortable and that you have enough time to

23    digest and use that document in the way you see most effective.

24    So do you want to take a 10-minute recess now and look at it

25    and then see if you can continue?

1    MR. LONGSTREET:  I got what I need from this document

2    right now.  I just need to ask a few follow-up questions.  But

3    to look at it in its entirety, I will probably ask for an

4    adjournment because I don't even know what's in it.

5    But specifically, I have some, some foundation

6    questions in regards to when this document was created, because

7    this document was created yesterday.  I didn't know when the

8    changes were made.

9    THE COURT:  It says it was printed yesterday.  I'm not

10    sure when it was created.  But these are all questions that you

11    should be asking.

12    But, look, if we're going to reconvene and adjourn, is

13    there any reason not to just do that now, so that you can put

14    together a single-flowing, most effective cross-examination

15    once you've had a chance to review the document?

16    MR. LONGSTREET:  May I ask, let me count them, five

17    foundation questions before we break?

18    THE COURT:  I'll give you eight, but as long as you're

19    at the microphone.

20    MR. LONGSTREET:  Very good.  Thank you, sir.

21    BY MR. LONGSTREET:

22    Q.  Sir, you originally drafted a police report in this case on

23    November 26, 2020; is that correct?

24    A.  That's correct.

25    Q.  And this document was provided to the Government, the

1   United States Government on December 1st, 2020, or it was

2   printed on that particular day; is that correct, sir?

3   A.  I suppose so.

4   Q.  I can't allow you to suppose.

5   A.  Okay.

6   Q.  Would reading this refresh your recollection as to when

7   this was printed from your department?

8   A.  That, I cannot answer.

9   Q.  If you read this document, it would not refresh your

10  recollection as to when this document was printed?

11  A.  If you -- if I could see it, I could refresh my

12  recollection.

13          MR. LONGSTREET:  May I approach?

14          THE COURT:  Sure.

15          MR. LONGSTREET:  Thank you.

16  BY MR. LONGSTREET:

17  Q.  Sir, would it be fair to say this document was printed on

18  December 1st, 2020, correct?

19  A.  Correct.

20  Q.  The document that you were reading from today was printed

21  on December 20th, 2021; is that correct?

22  A.  That's correct, sir.

23  Q.  Okay.  Very good.  And page 2 of the new document does

24  contain information that page 2 of the first document does not,

25  correct?

1  A.  Correct.

2  Q.  When were the changes made?

3  A.  I cannot answer that for you.  I can tell you that I have

4  made no additions, alterations or changes to my report between

5  the time your report was printed and the time mine was.

6  Q.  So you --

7  A.  The discrepancy, sir, if I may --

8        THE COURT:  Let the witness finish.  He's in the

9  middle of an answer.

10        Go ahead.

11        THE WITNESS:  Sir, the discrepancy is most likely due

12  to the detective at my department supplementing the report with

13  additional information.

14  BY MR. LONGSTREET:

15  Q.  Supplementing your report with additional information?

16  A.  Not my report, supplementing the case folder.

17  Q.  Okay.  Now, sir, this document is titled Reporting Officer,

18  Steven Fisher, correct?

19  A.  That's correct.

20  Q.  Okay.  And so this document will reflect that the

21  information contained within this document was submitted by

22  you, correct?

23  A.  The narrative portion of that report is mine and mine

24  alone.  There are, in the -- we use the Motorola P-1 police

25  report writing system.  In that system, the detectives or

 1  anybody else who is associated with the case who has additional

 2  information to add as far as case updates, the status of

 3  evidence, additional charges approved by the prosecutor, those

 4  are added in, supplemented by the detective, and that, in turn,

 5  would change the boxes that we've been discussing.  Whereas if,

 6  at the time when I arrested and lodged a subject, certain

 7  charges were listed as the arresting offenses, and if later the

 8  prosecution decided to add charges or remove charges, the

 9  detective would update the case folder, and those changes would

10  be reflected on the updated document that I had today.

11  Q.  Does your supervisor have the ability to change the

12  narrative?

13  A.  The ability?

14  Q.  My question directly to you --

15  A.  Yes.

16  Q.  -- is does the supervising officer in which has the

17  authority to change certain portions of your report also have

18  the ability to add or supplement to the narrative of your

19  report?

20  A.  If they did, that information would be contained in the

21  report writing system's audit.  Any time information is added

22  or changed, it would be in the report writing system's audit.

23          They would know, you'd be able to see when those --

24  when changes -- I'm speaking about my narrative portion right

25  now.  If somebody made changes to that, that would be reflected

 1    in the audit portion of the report writing system.

 2              MR. LONGSTREET:  I'm asking that the Court issue an

 3    order for the Metro Police Department to provide me that

 4    auditing information.

 5              MR. DEPORRE:  Your Honor, I don't think a court order

 6    is necessary in this case.  The Government will obtain an audit

 7    and produce it to Mr. Longstreet.  I have a few voir dire

 8    questions with respect to the report writing system if, if the

 9    Court may allow me to ask the witness.

10              THE COURT:  All right.  So essentially Mr. DePorre is

11    agreeing to provide you what you've asked for.

12              MR. LONGSTREET:  Okay.

13              THE COURT:  So I'll take his agreement.  I would do

14    the same with you.  You guys are officers of the court.  I

15    completely trust both of you.  So he'll get you that before we

16    reconvene.

17              Mr. DePorre, do you want to ask a couple of questions?

18              MR. DEPORRE:  Yes, I would.

19                              VOIR DIRE

20    BY MR. DEPORRE:

21    Q.  Officer Fisher, you reference that there was a detective

22    eventually assigned to this case.

23    A.  Correct.

24    Q.  Who was that?

25    A.  Detective J. Diem.

1    Q.  And did you refer this directly to the FBI or a member of

2    the FBI's task force for federal prosecution?

3    A.  Not -- I did not.

4    Q.  Do you know who, if anybody, referred the case for federal

5    prosecution?

6    A.  That would have been Detective Diem.

7    Q.  And do you know, based on the supplemental report that

8    Detective Diem prepared, who she contacted to refer the case

9    for federal prosecution?

10   A.  I would have to refresh my recollection.

11   Q.  And do you have that in the report that's in front --

12           THE COURT:  My guess is this isn't a refreshed

13   recollection; that he just doesn't know.  He would just be

14   reading the report.

15   BY MR. DEPORRE:

16   Q.  Did you know at one point who she referred it to?

17   A.  Yes.  I was told.  The name is escaping me right now is the

18   problem.

19           THE COURT:  All right.  Go ahead.

20   BY MR. DEPORRE:

21   Q.  Was it a member of the FBI task force?

22   A.  Yes.

23   Q.  Did you have contact with that person?

24   A.  No.

25   Q.  Is it normal for a detective before referring a case for

1   federal prosecution, if you know, to change the, the arrested

2   -- the information regarding the status of charges and so

3   forth?

4   A.  Yes.

5           MR. DEPORRE:  I have nothing further.

6           MR. LONGSTREET:  Do they usually do it one day before

7   a hearing?

8           THE COURT:  We don't know when it happened.  But look,

9   I'll give you a full chance to ask your questions, Mr.

10  Longstreet.

11          I just have one question before we adjourn.  What is

12  the northern most boundary of Mundy Township?

13          THE WITNESS:  Maple Avenue.

14          THE COURT:  Okay.  All right.  So this is what we're

15  going to do.  We're going to adjourn for today.  We will

16  continue this hearing.

17          I'd ask Mr. DePorre to do a couple of things, if you

18  would.  First, would you provide the audit that Mr. Longstreet

19  requested.

20          And second, would you confer with the folks at the

21  Metro Police agency and make sure that Mr. Longstreet has the

22  most updated copy of their entire police report file so that he

23  can use that for whatever purposes he deems appropriate?

24          MR. DEPORRE:  Yes, your Honor.  The copy that Mr.

25  Longstreet was produced in discovery does have redactions to

```
 1    the names of the, and identifier information of the other
 2    people that were arrested.  I would like to make the same
 3    redactions to the updated report, if that's acceptable.
 4              THE COURT:  Didn't we just identify those folks on the
 5    record?
 6              MR. DEPORRE:  We have.  I think that that's different
 7    from having it on the record than having it floating it around
 8    a county jail where those folks are going to be incarcerated as
 9    well.  And so I would ask -- perhaps I could talk to Mr.
10    Longstreet about --
11              THE COURT:  This is what I would suggest.  I'm okay
12    with a redacted copy going to Mr. Longstreet.  But what I'd
13    like you to do is confirm with Mr. Longstreet and identify for
14    him who is in the redactions so that he knows what's been
15    redacted.
16              MR. DEPORRE:  Absolutely.  And I can make available to
17    him an un-redacted report and he can sit it and read it.  I
18    just don't want it floating around the jail.
19              THE COURT:  Are you okay with that, Mr. Longstreet?
20              MR. LONGSTREET:  I'm okay with not providing my client
21    with any information he shouldn't have, including the name --
22              THE COURT:  I'm sorry.  Can you take off your mask?
23              MR. LONGSTREET:  I can, sir.  I can comply with any,
24    any form of protective order that the Court may issue and not
25    providing the information to my client that otherwise should be
```

1    redacted from the report.

2            THE COURT:  So what we'll do is Mr. DePorre will sit

3    down with you and show you an un-redacted copy so that you are

4    fully aware of who is behind the redactions.

5            MR. LONGSTREET:  Respectfully, sir, I already know.

6            THE COURT:  Oh, okay.  So you don't need that?

7            MR. LONGSTREET:  Respectfully, sir, I already know.

8            THE COURT:  All right.  Then we won't do that.

9            But, Mr. DePorre, you can provide the redacted report.

10   It will be the most recent version and a complete copy of

11   whatever police report there is, and the audit.  Will you get

12   that to Mr. Longstreet as soon as possible.

13           And then once you get that to Mr. Longstreet, will you

14   guys work with Mrs. Ryan to find the soonest possible date that

15   we can reconvene?  The schedule will be tight, but I don't want

16   to pick a date now before we know when you can get the stuff

17   off of the police computer.

18           MR. DEPORRE:  If I can confer with the witness?

19           THE COURT:  Sure.

20       (Brief pause.)

21           MR. DEPORRE:  Your Honor, I conferred with the

22   witness.  We estimate we can have that information within 24

23   hours, which means conservatively, that I could get it to Mr.

24   Longstreet certainly within a week.

25           THE COURT:  Okay.

1          MR. DEPORRE:  For scheduling purposes.

2          THE COURT:  All right.

3          MR. DEPORRE:  Mrs. Ryan, that may help Mrs. Ryan.

4          THE COURT:  All right.  So why don't you guys work

5    with her today to find the soonest possible date.  Let's -- it

6    seems like we won't need to set aside an entire day now.  We'll

7    have Mr. Longstreet's cross-examination of Officer Fisher.

8          Do you have any other witnesses, Mr. DePorre?

9          MR. DEPORRE:  I had two that were prepared to testify

10   today.  Sergeant, at the time he was Sergeant Johnson, Todd

11   Johnson.  He was the other officer that was present throughout

12   the entire happenings on Thanksgiving that day.  So he would be

13   -- he's now a lieutenant, but he would be one other witness.

14         And then there was an officer who responded to the

15   scene, Officer Anne Davies who is available to testify today as

16   well, and I intended to call today.  But I was going to -- I

17   can reevaluate the decision on whether or not we need to call

18   her and how long that testimony would be.

19         THE COURT:  Mr. Longstreet, do you have any plans to

20   call any witnesses?

21         MR. LONGSTREET:  No, sir, I do not.

22         THE COURT:  Okay.  So why don't you guys work with

23   Holly to find a date.  And then once you're done with that,

24   will you guys come back and see me in my office?

25         MR. DEPORRE:  Certainly.

1          THE COURT:  We're adjourned for today.  Thanks.

2          THE CLERK:  All rise.  Court is in recess.

3     (Proceedings concluded, 11:50 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MOTION HEARING - 12/21/2021

```
 1                    CERTIFICATE OF COURT REPORTER

 2

 3

 4          I certify that the foregoing is a correct transcript

 5   from the record of proceedings in the above-entitled matter.

 6

 7   _____s/Christin E. Russell__          December 21, 2021
     CHRISTIN E. RUSSELL                    Date
 8   FCRR, RDR, CRR, CSR-5607
     Federal Official Court Reporter
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```